**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Case No.: GJH-18-468** |
| | * | |
| **JANET STURMER,** | | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**<u>MEMORANDUM OPINION</u>**

The COVID-19 pandemic has created a new normal for most. We wash our hands with relentless frequency, as if we can scrub away both the virus and the anxiety it causes. We stay in our homes unless our employment deems us essential or it is absolutely necessary to venture outside. When we do leave our homes, we put on masks and use hand sanitizer immediately after making contact with any object, whether living or inanimate. If, by chance, we actually come into contact with other human forms of life, we stand no closer than six feet, even from our neighbors and closest friends.

Because we all have different levels of risk tolerance, within the bounds of the law, we may choose to implement these measures with differing levels of rigor. Anxiety and fear cause some to go even beyond published guidelines on social distancing, while the despair of isolation causes others to find creative ways to maintain their sanity while still more broadly adhering to prevailing guidance and local orders.

But what happens when you do not have the freedom to control your surroundings? To be sure, a lack of control and freedom is a necessary consequence of incarceration, whether pre-

trial, pre-sentence or post-sentence. This takes on different meaning, however, where this loss of control and freedom goes beyond that which incarceration generally necessitates and extends to an inability to take measures that have been described as some of "the best tools we have to avoid being exposed to [COVID-19] and slowing its spread locally and across the country and world." *See Social Distancing, Quarantine, and Isolation*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html. In this context, you are dealing with the same anxiety with which all members of society currently struggle, but without the freedom to control the measures taken to protect your health. And even that, the Court would suggest, is an acceptable necessity of incarceration; until, that is, basic measures—measures that have already become painfully routine in our society at large—are not taken by those charged to protect the people they incarcerate. You are then rendered helpless to prevent the spread in your surroundings of a virus that is now responsible for over sixty thousand deaths in this country.

Such is the experience of prisoners awaiting sentencing at the Central Treatment Facility ("CTF") of the D.C. Jail, including Defendant Janet Sturmer. Ms. Sturmer is currently detained pending sentencing after she pleaded guilty to conspiracy to commit mail and wire fraud and aggravated identity theft. Pending before the Court is Ms. Sturmer's Motion for Reconsideration of Memorandum Opinion and Order Denying Emergency Motion for Review of Detention Order ("Motion for Reconsideration"). ECF No. 293. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Ms. Sturmer's Motion for Reconsideration is granted, and she will be released with conditions.

## I.    DISCUSSION

The procedural background of this case was discussed at length in the Court's prior opinion addressing Ms. Sturmer's earlier request to be released. *See* ECF No. 292 at 1–3. Her prior attempt articulated the same primary argument raised by Ms. Sturmer now: that the ongoing COVID-19 pandemic has infiltrated the detention facility where she is being held and that she is particularly vulnerable to contracting and suffering from more severe symptoms of the virus. This Court rejected Ms. Sturmer's prior attempt to be released after considering the appropriate factors in the Bail Reform Act and, in some measure, taking comfort in assurances from the Government that the D.C. Department of Corrections ("DOC") was following appropriate measures to address the spread of COVID-19 inside its facilities. While the Court is absolutely certain that the assurances made by the Government were made in good faith, findings made in an ongoing civil proceeding have since demonstrated that those assurances were inaccurate. *See Banks v. Booth*, No. 20-849-CKK, ECF No. 49 (D.D.C. Apr. 19, 2020).

In *Banks*, the court granted in part a Motion for a Temporary Restraining Order based in part on a finding that there was a likelihood of success on the merits of claims that the conditions of confinement in DOC facilities violated the right of detainees to due process under the Fourteenth Amendment and of inmates under the Eighth Amendment by failing to adequately protect their health and safety. *See Banks*, No. 20-849-CKK, ECF No. 49 at 22. According to a report submitted to the *Banks* court by independent investigators, as of April 4, 2020, the infection rate in DOC facilities was over seven times the rate for the District of Columbia at large. *Id.* at 13. Among other findings, as of April 19, 2020, the D.C. Jail had been slow to, and had failed to, operationalize and enforce social distancing measures; failed to implement contact tracing when correctional staff tested positive; had been slow to respond to inmates displaying

symptoms of COVID-19, such as fever and coughing; did not properly seal off quarantined inmates from the general population or require proper use of masks and gloves for those present in the quarantine unit; and left inmates in isolation for having tested positive without access to showers or laundry services. *Id.* at 14–15, 19–21. Based on these findings, the court concluded that the evidence suggested that the D.C. Jail acted with deliberate indifference to inmate health and safety because it was aware of the risks of COVID-19, but "disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus." *Id.* at 22. Although the court did not order the immediate release or transfer of detainees, it ordered as a first step certain remedial actions, including that the D.C. Jail improve the triage process for suspected cases of COVID-19, provide proper cleaning supplies to each unit in the facility, and implement social distancing measures. *Id.* at 27–28, 30.

The Government contends in its response to Ms. Sturmer's Motion for Reconsideration that DOC is now implementing the necessary precautionary measures ordered in *Banks*. On the current record, however, it is far from clear that reasonable precautions are currently in place. "Notably, there is no evidence that the D.C. Jail has any policies or procedures specifically aimed at protecting individuals with high-risk medical conditions," *see United States v. Keaton*, No. TDC-18-0215, ECF No. 84 at 5–6 (D. Md. Apr. 23, 2020), and the Court no longer has the same confidence that the jail is doing all it can to protect Ms. Sturmer or that it has the ability to address her specific issues should any problems arise.

Ultimately, however, information regarding conditions at D.C. Jail merely provides important context for the Court's decision.[1] The Court, here, is not being asked to undertake the

---

[1] Conditions at the jail would be more directly relevant if this Court were considering temporary release under 18 U.S.C. § 3142(i) and applying what has already become commonly known as the *Creek* factors. *See United States v. Creek,* No. 20-4251, ECF No. 18 (4th Cir. Apr. 15, 2020). However, because the Court finds that release with conditions under 18 U.S.C. § 3143 is appropriate, the Court need not consider temporary release.

same analysis as the *Banks* court and determine whether a constitutional violation has occurred

that would require the wholesale release of defendants detained at that facility. Instead, this

Court, like many others, is asked to wrestle with the question of how all of these circumstances

should factor into a detention decision under the Bail Reform Act.

As always, the Court is guided by the relevant provisions of the Bail Reform Act, 18

U.S.C. § 3143, in determining whether to release an individual who has been found guilty of an

offense and is awaiting sentencing. Section 3143(a)(1) provides that a person awaiting

sentencing "shall" be detained unless the Court "finds by clear and convincing evidence that the

person is not likely to flee or pose a danger to any other person or the community." *Id.* §

3143(a)(1).[2] The Court considers a variety of factors in determining whether there are conditions

of release that will assure the defendant's future appearance in court and the safety of the

community, including "the nature and circumstances of the offense charged, including whether

the offense is a crime of violence … or involves a … controlled substance [or] firearm"; "the

weight of the evidence against the person"; "the history and characteristics of the person …";

and "the nature and seriousness of the danger to any person or the community that would be

posed by the person's release." *Id.* § 3142(g).

Among the subcategories identified for consideration of a defendant's history and

characteristics is the defendant's "physical and mental condition." 18 U.S.C. § 3142(g)(3)(A). To

be clear, however, a fair reading of the provision indicates to the Court that a defendant's health

is to be considered to the extent it impacts the likelihood she would flee or be a danger to the

community if released, and not the impact of imprisonment on the defendant's health. *See id.* §

3142(g) ("The judicial officer shall, *in determining whether there are conditions of release that*

---

[2] The mandatory detention provision of 18 U.S.C. § 3143(a)(2) does not apply to this case.

*will reasonably assure the appearance of the person as required and the safety of any other*

*person and the community*, take into account the available information concerning— …"

(emphasis added)).

With regard to Ms. Sturmer's health, it is worth noting that she is, as of this writing,

approximately three months shy of her sixty-fifth birthday, the age at which one is considered to

be part of the vulnerable population of older adults as it relates to COVID-19. *See People Who*

*Need Extra Precautions: Older Adults*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Apr.

7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

Her medical records, while lengthy, do not appear to contain a specific diagnosis of a respiratory

condition, but they do detail what appears to be a persistent cough for which she has been

prescribed Albuterol. Albuterol is used to treat wheezing and shortness of breath caused by

breathing problems such as asthma. *Albuterol Oral Inhalation*, U.S. NATIONAL LIBRARY OF

MEDICINE: MEDLINEPLUS (Feb. 15, 2016), https://medlineplus.gov/druginfo/meds/a682145.html.

Also, of some relevance here, Ms. Sturmer's records indicate that she suffers from an Anxiety

Disorder.

Upon filing her original motion for release, it was a close question as to whether Ms.

Sturmer had met her burden under § 3143. Ms. Sturmer has no history of violence, but the Court

was concerned by her significant history and pattern of fraud and identity theft. ECF No. 292 at

4–5. Additionally, documents and equipment found during a search of her residence reflected her

proficiency for making counterfeit identification documents that could be used in an attempt to

flee the jurisdiction. *Id.* Thus, the Court found, consistent with an earlier ruling by the Magistrate

Judge, that Ms. Sturmer had not demonstrated by clear and convincing evidence that she was not

a danger and not likely to flee.

The Court now reconsiders its prior ruling for at least two reasons.

First, Pre-Trial Services has now had the opportunity to investigate Ms. Sturmer's proposed third-party custodian. She will be able to stay with her brother and his wife and daughter at their home in Preston, Maryland, where she will be able to self-quarantine in her own room. Although Pre-Trial Services has some reservations about the frequency with which her brother's work obligations will keep him away from the home, the Court believes that the Defendant's brother is otherwise a suitable third-party custodian. Upon release, Ms. Sturmer can also be subjected to location-monitoring, travel restrictions, mental health treatment, and drug testing.

Second, the Court now also finds that it is extraordinarily unlikely that a sixty-four-year-old with an ailment requiring treatment with Albuterol and a diagnosed Anxiety Disorder will attempt to flee the jurisdiction during the pendency of a global pandemic for which she is particularly vulnerable and which is almost certain to still be ongoing when she is ultimately sentenced and designated to the Bureau of Prisons.

Additionally, the Court acknowledges that while the information gleaned from the *Banks* opinion does not fit neatly into the relevant factors the Court has considered under §§ 3143(a)(1) and 3142(g), it sharpens the Court's focus. A reminder of what life in certain local pre-trial detention facilities actually involves (even in non-pandemic circumstances) challenges this Court to give searching review to whether detention is truly required prior to the Court imposing its sentence and the defendant being designated to a Bureau of Prisons facility. The Court certainly hopes DOC implements and maintains the improvements ordered by the *Banks* court, but rather than find judicial comfort in additional government assurances, the Court finds there are

conditions that can satisfy its concerns specific to Ms. Sturmer's risk of flight and danger to the community.

Accordingly, after weighing the appropriate considerations in the Bail Reform Act, the Court concludes that there is clear and convincing evidence that under the conditions imposed by the Court, Ms. Sturmer is not likely to flee or pose a danger to the safety of any person or the community if released.

## II.    CONCLUSION

For the foregoing reasons, it is ordered by the United States District Court for the District of Maryland that Ms. Sturmer's Motion for Reconsideration is granted. A separate Order shall issue.

Date: <u>May    1, 2020</u>                              <u>   /s/                                        </u>
                                                        GEORGE J. HAZEL
                                                        United States District Judge